James P. Murphy, WSBA #18125
Brian C. Armstrong, WSBA #31974
Murphy, Armstrong & Felton LLP
719 Second Ave., Suite 701
Seattle, WA 98104
Telephone: (206) 985-9770
jpm@maflegal.com

Michael J. Kleffner (*pro hac vice*)
SHOOK, HARDY, & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO, 64108
Tel: 816.474.6550 | Fax: 816.421.5547
mkleffner@shb.com

*Attorneys for Defendant*
DAIMLER TRUCK NORTH AMERICA LLC ("DTNA")

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STEPHEN BURGESS, individually, and BRUCE WOLF, as the court-appointed Personal Representative of the Estate of DEBORA M. BURGESS and on behalf of all statutory wrongful death beneficiaries,<br><br>Plaintiffs,<br><br>v.<br><br>DAIMLER TRUCK NORTH AMERICA, a Delaware limited liability company; HTS LOGISTICS, INC., an Illinois corporation; SAHIL TAYA and JANE DOE TAYA, husband and wife; and XYZ Corporations (1-5).<br><br>Defendants. | Case No. 1:23-CV-03054<br><br>**DAIMLER TRUCK NORTH AMERICA LLC'S MOTION FOR PROTECTIVE ORDER RELATING TO PLAINTIFFS' NOTICE OF 30(B)(6) DEPOSITION TO DAIMLER TRUCK NORTH AMERICA LLC**<br><br>**1/31/2024**<br>**Without Oral Argument** |

Daimler Truck North America LLC ("DTNA") respectfully moves the Court to enter a protective order pursuant to Fed. R. Civ. P. 26(c)(1)(A) and (D) that limits the scope of testimony

DAIMLER TRUCK NORTH AMERICA LLC'S MOTION FOR PROTECTIVE ORDER
Page | 1

Murphy, Armstrong & Felton LLP
719 Second Ave., Suite 701
Seattle, WA 98104
(206) 985-9770

DTNA must provide pursuant to Plaintiffs' Notice of Rule 30(b)(6) Deposition of DTNA ("Notice of Deposition"), attached at **Exhibit 1** to the Declaration of Michael J. Kleffner (hereinafter, "Decl."). Counsel for DTNA and Plaintiffs have met and conferred regarding the notice topics and have been unable to reach resolution regarding their scope. Decl. ¶¶ 3-10 and Exhibit 2. Accordingly, DTNA respectfully seeks the assistance of the Court in limiting the notice topics to appropriate Rule 30(b)(6) subjects.

I.   **INTRODUCTION AND BACKGROUND**

This case involves an accident that occurred on August 15, 2022 at about 7:45 p.m. On that date, Debora Burgess was walking across a Pilot Truck Stop parking lot. At the same time, Sahil Taya was driving a 2022 Freightliner Cascadia (the "subject truck") within the same parking lot to refuel. As Mrs. Burgess walked through the parking lot, she crossed into the subject truck's path of travel, was struck, knocked down, and became wedged between the asphalt and the subject truck's front tire. Tragically, Mrs. Burgess remained wedged between the asphalt and front tire as the subject truck continued driving toward the fuel pumps. Mrs. Burgess succumbed to her injuries the next day. Based on police reports and investigative materials, Mr. Taya did not see Mrs. Burgess walking across the parking lot, perhaps due to glare created by the setting sun. *See generally* Complaint, ECF No. 1 at ¶¶ 3.1 – 3.10.

Plaintiffs' product liability theory against DTNA is **exceedingly simple.** When the subject truck was sold, DTNA offered Detroit Assurance 5.0 as a base model, standard feature on the Cascadia model. Decl. ¶¶ 12 and 17, Exs. 3, 8 and 9. Detroit Assurance 5.0 is a suite of safety systems that uses a radar and camera system to detect certain pedestrians in the vehicle's path and, if necessary, issue audible and visual alerts, followed by automatic braking if the driver does not respond. Again, Detroit Assurance 5.0 was a **standard feature** for the subject truck; however, like

DAIMLER TRUCK NORTH AMERICA LLC'S MOTION FOR PROTECTIVE ORDER
Page | 2

Murphy, Armstrong & Felton LLP
719 Second Ave., Suite 701
Seattle, WA 98104
(206) 985-9770

other manufacturers, DTNA allowed customers to de-select Detroit Assurance 5.0 if the customer did not wish to equip the truck with the system. *Id.* at ¶ 12, Ex. 3. If that happened, the customer received a monetary credit. *Id.* That occurred here: the ordering customer did not equip the truck with Detroit Assurance 5.0. **Thus, Plaintiffs' theory invokes *one question*: why did DTNA offer Detroit Assurance 5.0 as a standard feature, but with the ability to de-select the system?**[1]

Despite the simplicity of this issue, Plaintiffs issued a Rule 30(b)(6) deposition notice to DTNA that includes broad-ranging, reptilian topics that require DTNA to provide **opinion** testimony on many irrelevant issues. Decl. ¶ 2, Ex. 1. DTNA has no obligation to respond to these topics, as DTNA must only provide testimony regarding "information known or reasonably available" to it – which does not include opinion-based, hypothetical, or speculative testimony. *See* Rule 30(b)(6); *Mitchell v. Atkins*, 2019 WL 6251044 at * 2 (W.D. Wash. 2019) ("an organization has no obligation under Rule 30(b)(6) to testify as to matters it cannot reasonably gain knowledge of."); *Boyer v. Reed Smith, LLP*, 2013 WL 5724046, at *4 (W.D. Wash. 2013) ("Plaintiff is not permitted to request an expert opinion as to whether certain practices complied with corporate policies. The inquiry must be confined to matters "known or reasonably available

---

[1] The Tenth Circuit recently affirmed summary judgment in favor of DTNA in a case involving an earlier model Cascadia where an automatic braking system was an **optional**, not standard, feature. There, the federal district court ruled that a Cascadia without an automatic emergency braking system was **not unreasonably dangerous as a matter of law**. The Tenth Circuit affirmed in *Butler v. Daimler Trucks N. Am., LLC*, 74 F.4th 1131, 1140 (10th Cir. 2023). Decl. ¶ 18, Ex. 10 (*Butler* opinion). DTNA is not just previewing dispositive motion practice; rather, this information should factor into the Court's Rule 26 proportionality analysis.

DAIMLER TRUCK NORTH AMERICA LLC'S MOTION FOR PROTECTIVE ORDER
Page | 3

Murphy, Armstrong & Felton LLP
719 Second Ave., Suite 701
Seattle, WA 98104
(206) 985-9770

to the organization."); *Edwards v. Scripps Media, Inc.*, 331 F.R.D. 116, 120-21 (E.D. Mich. 2019) (hypothetical questions "are not appropriate for a Rule 30(b)(6) deposition" for multiple reasons).

## II.    THE NOTICE TOPICS

To assist the Court, DTNA has grouped topics that contain a common issue or objection.

### A.  Reptile Topics:  Nos. 1-4, 15, 17-18

The Court may be familiar with "reptile tactics" used in personal injury lawsuits. Reptile tactics are based on a discredited theory of psychology that human beings possess a primitive portion of the brain called the "reptilian brain." This portion of the brain supposedly focuses on survival instincts and safeguarding the community. In legal practice, lawyers try to convince jurors that a defendant broke a "safety rule" or has threatened the safety of the community. If jurors are so convinced, the reptile theory posits that jurors will try to "protect the community" by awarding artificially increased damages to enhance safety and decrease danger to public.

**Topics 1-3** are straight from the reptile playbook. Like all reptilian questions, Topics 1-3 are **highly objectionable** because they are overly broad, impossible to answer, require DTNA to speculate, and any conceivable answer would be opinion-based. In general, Topics 1-3 ask DTNA to testify about the "relative level" or "extent to which" DTNA considered safety in the decision to make Detroit Assurance 5.0 a standard feature but with an option to de-select the system.

Important background is required on this decision. Decl. ¶¶ 12 and 17. In 2018, DTNA offered Detroit Assurance 4.0, the predecessor system to Detroit Assurance 5.0. *Id.* at ¶ 17, Exs. 8 and 9 (Interrogatory No. 24). Initially, DTNA offered Detroit Assurance 4.0 as an available optional feature on the Cascadia. *Id.* In March 2018, DTNA announced Detroit Assurance 4.0 would become a standard feature with an option to de-select the system. *Id.,* Ex. 8. In discovery, DTNA has produced dozens of emails that include at least twenty-five DTNA personnel where

DAIMLER TRUCK NORTH AMERICA LLC'S MOTION FOR PROTECTIVE ORDER
Page | 4

Murphy, Armstrong & Felton LLP
719 Second Ave., Suite 701
Seattle, WA 98104
(206) 985-9770

making Detroit Assurance 4.0 a standard feature is discussed and, ultimately, decided. *Id* ¶ 17; *see also Id.,* Ex. 9 (Interrogatory No. 22, listing people). The emails reflect various considerations factored into this decision, including customer choice, customer acceptance of systems like Detroit Assurance 4.0, and other factors. *Id.*; *see also Id.,* Ex. 9 (Interrogatory No. 24, listing factors). DTNA also evaluated information received from the field. *Id.* In fact, based on certain field input, objections existed as to making Detroit Assurance 4.0 a standard feature (i.e., it should be kept an available option). Nevertheless, after considering multiple views from multiple people, DTNA made Detroit Assurance 4.0 a standard feature for the Cascadia in 2018, with the option to de-select the system if the customer wanted. *Id.*; *see also Id.* ¶ 12, Ex. 3. Once DTNA made that decision, it carried over to Detroit Assurance 5.0 when that system became available in 2019. *Id.*

Topics 1-3 must be considered against this factual backdrop. While DTNA does not object to testifying whether safety was **a factor** in its 2018 decision-making (or testifying about **facts** reflected in the emails), the fundamental problem with Topics 1-3 is they require DTNA to testify regarding the "relative level" (Topic 1) and "extent" (Topics 2-3) that DTNA considered safety in the decision-making process **as compared to** other criteria, such as sales, profitability, etc. In short, Topics 1-3 require DTNA to retrospectively "rank" or "quantify" where safety placed in the 2018 decision-making as compared to numerous other factors that must be considered in deciding whether certain features should be standard or available optional equipment.

**This cannot be done.** The 2018 decision-making involved many people who considered multiple factors in deciding whether Detroit Assurance 4.0 should be a standard feature with the option to de-select the system. That input was based, in part, on information DTNA received from outside sources, such as customers. Given the collective way the 2018 decision-making occurred, DTNA cannot interview all participants to the 2018 discussions (which would be impossible),

DAIMLER TRUCK NORTH AMERICA LLC'S MOTION FOR PROTECTIVE ORDER
Page | 5

Murphy, Armstrong & Felton LLP
719 Second Ave., Suite 701
Seattle, WA 98104
(206) 985-9770

evaluate all sources of information they considered, and "input" that data into a mathematical equation or formula to determine where safety "ranked" in the final decision as compared to other criteria. But that is the calculus that Topics 1-3 require.

Topic 3 takes the problem to a higher level. There, Plaintiffs ask DTNA to testify about the "circumstances" where a truck sold with the "Detroit Assurance 5.0 system is **safer or less safe** than an otherwise identical truck sold without such a system." (emphasis added). For obvious reasons, an **infinite** number of potential answers exist to that question, all of which depend entirely on the way the truck is being used or driven. By way of analogy, older cars without modern safety systems can be driven in a **very safe** manner. Conversely, a 2024 Tesla with every conceivable safety feature can be operated in an **incredibly unsafe** manner. The same is true for heavy trucks: ultimately, the driver is responsible for how safely or unsafely a truck is driven. **NHTSA agrees with this point.** Decl. ¶ 13, Ex. 4 (stating, for vehicles with Level 0-2 automation, "the driver is fully responsible for driving the vehicle[.]"). DTNA cannot opine about the infinite number of ways that trucks without Detroit Assurance 5.0 are "safer or less safe" than trucks with the system.

**Topic 4** has the same problems, but in a different way. Topic 4 asks DTNA to testify regarding the ways trucks with Detroit Assurance 5.0 "would be less useful" than trucks without Detroit Assurance 5.0. Like the impossible "safer or less safe" calculus requested in Topic 3, the "usefulness" of trucks is dependent on the manner in which they are used or driven. For instance, some vocational truck applications are incompatible with Detroit Assurance 5.0 because equipment may block the system's radar and/or camera. Would the operator of such a truck find Detroit Assurance 5.0 "less useful" than another operator whose truck did not include equipment that blocked the radar or camera? Maybe so – but that question is for the owners or operators of the trucks, and differences of **opinion** may exist. In addition, the Detroit Assurance system, like

DAIMLER TRUCK NORTH AMERICA LLC'S MOTION FOR PROTECTIVE ORDER
Page | 6

Murphy, Armstrong & Felton LLP
719 Second Ave., Suite 701
Seattle, WA 98104
(206) 985-9770

**all** similar systems, is not perfect and has limitations. To be blunt, systems like Detroit Assurance may react in ways that some drivers dislike, even though the system reacts as designed. To use an "Operator Manual" example, Detroit Assurance 5.0 may initiate automatic braking in response to a vehicle making a right-hand turn, even though the driver knows the forward vehicle will have completed its right-hand turn before the truck gets to that location. Does that render Detroit Assurance 5.0 less useful? Some drivers may say yes; others may say no; and differences of **opinion** will exist – but the answer depends on the driver and the circumstances. In sum, DTNA cannot identify the infinite number of ways that trucks are used and arrive at "corporate testimony" on the comparative usefulness of trucks with or without Detroit Assurance.

**Topic 15:** As noted, DTNA cannot provide the "full rationale" – i.e., every single consideration – that factored into the decision to make Detroit Assurance 5.0 standard with the ability to de-select the system. *See also* Decl. ¶ 17, Ex. 9 (Interrogatory 24). Again, DTNA **does not object** to providing testimony on "factors and considerations" that are known or reasonably available to DTNA **as long as** DTNA is not asked to "rank" factors regarding their "relative level of importance" as sought in Topics 1-3.

**Topics 17 and 18:** These reptilian and argumentative topics ask DTNA to testify whether it researched "the seriousness of potential harms that could be avoided" (Topic 17) and "attempted to quantify the costs of human injuries" (Topic 18) in making Detroit Assurance 5.0 standard with an option to de-select the system. The obvious intent of these topics is to get DTNA to admit it did not do something that **is impossible to do.** For starters, "potential harms" can range from a tragedy like the subject accident or a "near miss" that frightens a pedestrian. But how does DTNA then connect the vast range of "potential harms" back to its decision to offer Detroit Assurance 5.0 as a standard feature with the ability to de-select the system? That cannot be done, as a multitude of

DAIMLER TRUCK NORTH AMERICA LLC'S MOTION FOR PROTECTIVE ORDER
Page | 7

Murphy, Armstrong & Felton LLP
719 Second Ave., Suite 701
Seattle, WA 98104
(206) 985-9770

intervening causes exist between the decision and the ultimate "harm" that occurred, such as customer decision-making, driver hiring and training, driver operation of the truck, etc. Indeed, this case presents an example: the time of year, time of day, and even **position of the sun** may have factored into the "harm" that occurred. Likewise, for Topic 18, DTNA cannot "quantify the costs of human injuries." Is DTNA supposed to testify whether Mrs. Burgess' death resulted in more "costs" than if someone else had been run over? No, it is not: DTNA is not required to give such inflammatory, speculative, and opinionated testimony.

### B. National Transportation Safety Board (NTSB) Topics: Nos. 5 and 6

In 2015, the NTSB issued two recommendations to all truck manufacturers: (1) install forward collision avoidance systems that include, at a minimum, a forward collision warning component, as standard equipment on all new vehicles (H-15-8); and (2) once NHTSA publishes performance standards for autonomous emergency braking, install systems meeting those standards on all new vehicles (H-15-9). Decl. ¶ 14, Ex. 5. Importantly, these recommendations derived from the NTSB's investigation into rear-end crashes and its corresponding report entitled, *The Use of Forward Collision Avoidance Systems to Prevent and Mitigate Rear-End Crashes*. *Id.* As the title makes clear, the 2015 NTSB report addressed **rear-end crashes.** *Id.* The report repeatedly confirms that point. *Id.* at Abstract (repeatedly referring to "rear-end" crashes) and 6 ("[t]his report describes the common causes of rear-end crashes…"). *Id.*

Topics 5 and 6 are taken directly from NTSB recommendation H-15-8. Plaintiffs must be seeking testimony to use in other cases because the 2015 NTSB recommendations did not address systems that included pedestrian detection capability, which is the only functionality at issue here. Simply put, as the NTSB's report and recommendations make clear, the NTSB's 2015

DAIMLER TRUCK NORTH AMERICA LLC'S MOTION FOR PROTECTIVE ORDER
Page | 8

Murphy, Armstrong & Felton LLP
719 Second Ave., Suite 701
Seattle, WA 98104
(206) 985-9770

recommendations did not address – and were not intended to address – pedestrian detection systems or incidents involving pedestrians.

Topics 5 and 6 also address NHTSA. As noted in NTSB recommendation H-15-9, NTSB recommended that NHTSA publish performance standards for automatic emergency braking systems. This past summer, NHTSA issued a Notice of Proposed Rulemaking (NPRM) to require automatic emergency braking systems in heavy trucks. Notably, NHTSA **excluded** pedestrian detection functionality from its NPRM. 88 Fed. Reg. 43174, 43237 (July 6, 2023) (stating, "NHTSA is not proposing PAEB [Pedestrian Automatic Emergency Braking] for heavy vehicles in this NPRM. NHTSA believes **there are unknowns at this time about the performance of PAEB** on heavy vehicles in the U.S., as well as cost and other technical and practicability considerations to support a proposed implementation of PAEB for heavy vehicles.") (emphasis added). So, even today, while NHTSA seeks to mandate automatic emergency braking systems in heavy trucks, it remains unwilling to require pedestrian detection capability within those same systems or create performance standards for pedestrian detection systems.

Thus, it would be an egregious mixing of "apples and oranges" to allow Plaintiffs to obtain testimony regarding 2015 NTSB recommendations that had nothing to do with mitigating injuries to pedestrians. NHTSA's recent NPRM comments bolster this point, as they underscore the significant technological and performance differences between pedestrian detection and vehicle detection – and only pedestrian detection is at issue here.

### C. All Other Collision Mitigation Systems Offered by DTNA: Nos. 7-8

While some of Plaintiffs' Notice topics are limited to Detroit Assurance 5.0, Topics 7 and 8 are not. Instead, these topics address **all collision mitigation systems** that "DTNA developed and/or made available[.]" This includes systems that did not include automatic braking, let alone

DAIMLER TRUCK NORTH AMERICA LLC'S MOTION FOR PROTECTIVE ORDER
Page | 9

Murphy, Armstrong & Felton LLP
719 Second Ave., Suite 701
Seattle, WA 98104
(206) 985-9770

pedestrian detection capability. Because Detroit Assurance 5.0 was the only system with pedestrian detection capability available in 2022, DTNA respectfully suggests the topics should be limited to that system, and DTNA should not testify regarding historical systems not at issue.

### D. Increase in Manufacturing Cost:  Topic 13

Topic 13 seeks testimony regarding the "marginal increase in manufacturing cost" to DTNA if the subject truck had been equipped with Detroit Assurance 5.0. DTNA does not object to testifying whether "manufacturing cost" factored into the decision to make Detroit Assurance 5.0 a standard feature with a de-select option. But Topic 13 goes much farther:  it requires DTNA to reconstruct the added manufacturing cost if the subject truck had (hypothetically) been built with Detroit Assurance. Even if that analysis could be performed, the subject has zero relevance where, as here, Detroit Assurance 5.0 was a standard feature on the truck at issue.

### E. Whether DTNA Agrees or Disagrees with a NHTSA Study:  Topic 14

Plaintiffs ask DTNA to testify about "a September 27, 2018 study entitled *Cost and Weight Analysis of Heavy-Duty vehicle Forward Collision Warning (FCW) and Automatic Emergency Braking Systems for Heavy Trucks* by Ricardo, Inc. Specifically, "if DTNA disagrees with any statements, analysis, and/or conclusions in the study, its representative should be prepared to testify as to what DTNA believes the correct information, statement, analysis, and/or cost figures should be[.]" Based on undersigned counsel's review, the study was conducted pursuant to a contract by NHTSA. Decl. ¶ 16, Exs. 6 and 7. The report is 124 pages in length. *Id.,* Ex. 7. The purpose of the study "is to determine the product piece, total system cost, incremental consumer price, and weight of FCW/AEB systems on medium duty and heavy duty trucks to provide insight into the safety and efficiency benefits of using the systems for crash avoidance." *Id.,* Ex. 7 at 5.

DAIMLER TRUCK NORTH AMERICA LLC'S MOTION FOR PROTECTIVE ORDER
Page | 10

Murphy, Armstrong & Felton LLP
719 Second Ave., Suite 701
Seattle, WA 98104
(206) 985-9770

While the report includes data on two DTNA vehicles, it includes data on other manufacturer's vehicles and other vehicles' collision mitigation systems.

DTNA should not be required to read the study, obtain the data the researchers reviewed (impossible to do), and determine if it "agrees or disagrees" with *any* "information, statements, analysis, and/or conclusions contained in the study," *and then* "testify as to what DTNA believes the correct information, statement, analysis, and/or cost figures should be." Doing so would require opinion testimony of the highest degree. And, complying with this topic would necessarily require DTNA to review information possessed outside DTNA, which fails Rule 30(b)(6)'s requirement that DTNA testify as to information "reasonably available" to it.

### F. Affirmative Defenses:  Topic 19

Topic 19 asks DTNA to testify to "[a]ll facts that support your Affirmative Defenses Number 6 [fault of other parties], 7 [misuse, modifications, etc.], 13 [unavoidable circumstances and intervening cause], and 14 [negligence or fault of other parties]." ECF No. 14 (DTNA answer). DTNA's representative should not be required to act as a conduit for DTNA's counsel's mental impressions and work product, which is exactly what would occur if DTNA testified about these fact-specific affirmative defenses. Simply put, Rule 30(b)(6) does not provide a mechanism to discover attorney work product, which is also not "information known or reasonably available" to DTNA. *Luken v. Christensen Group Inc.*, 2018 WL 1994121, at *2-*3 (W.D. Wash. 2018) (granting protective order where Plaintiff sought testimony regarding the "factual basis, details, corroborating evidence, and other details of defendant's affirmative defenses[.]").

DTNA respectfully requests the Court enter a protective order pursuant to Fed. R. Civ. P. 26(c)(1)(A) and (D) that forbids or limits the scope of testimony DTNA must offer in response to Topics 1-8, 13-15, and 17-19.

DAIMLER TRUCK NORTH AMERICA LLC'S MOTION FOR PROTECTIVE ORDER
Page | 11

Murphy, Armstrong & Felton LLP
719 Second Ave., Suite 701
Seattle, WA 98104
(206) 985-9770

DATED this 28th day of December, 2023.

/s/ Michael J. Kleffner
Michael J. Kleffner, *pro hac vice*
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, MO 64108
(816) 474-6550
mkleffner@shb.com

and

James P. Murphy, WSBA #18125
Brian C. Armstrong, WSBA #31974
Murphy, Armstrong & Felton LLP
719 Second Avenue, Suite 701
Seattle, WA 98104
(206) 985-9770
jpm@maflegal.com
bca@maflegal.com

*Attorneys for Defendant*
*Daimler Truck North America LLC*

DAIMLER TRUCK NORTH AMERICA LLC'S MOTION FOR PROTECTIVE ORDER
Page | 12

Murphy, Armstrong & Felton LLP
719 Second Ave., Suite 701
Seattle, WA 98104
(206) 985-9770

## CERTIFICATE OF SERVICE

I hereby certify that on December 28, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System:

Kevin Coluccio, WSBA #16245
Coluccio Law
2120 1st Avenue North, Suite 201
Seattle, Washington 98109
T/206.826.8200; F/206.673.8286
kc@coluccio-law.com

Kenneth R. Friedman, WSBA #17148
Lincoln D. Sieler, WSBA #20774
Richard H. Friedman, WSBA #30626
Friedman Rubin PLLP
1126 Highland Avenue
Bremerton, Washington 98337
T/360.782.4300; F/360.782.4358
rfriedman@friedmanrubin.com
kfriedman@friedmanrubin.com
lsieler@friedmanrubin.com

*Attorneys for Plaintiffs Stephen Burgess, Bruce Wolf and Debora M. Burgess*

Skyler P. Urban, WSBA #58761
Francis S. Floyd, WSBA #10642
Floyd, Pflueger & Ringer P.S.
3101 Western Ave, Suite 400
Seattle, Washington 98121-3017
T/206.441.4455; F/206.441.8484
ffloyd@floyd-ringer.com
surban@floyd-ringer.com

*Attorneys for Defendants HTS Logistics and Sahil Taya*

DATED at Seattle, Washington this 28th day of December, 2023.

By:    */s/ Angelina Hernandez*
          Angelina Hernandez, Paralegal

DAIMLER TRUCK NORTH AMERICA LLC'S MOTION FOR PROTECTIVE ORDER
Page | 13

Murphy, Armstrong & Felton LLP
719 Second Ave., Suite 701
Seattle, WA 98104
(206) 985-9770