FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Sep 30, 2025

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STEPHEN BURGESS, individually, BRUCE WOLF, as the court-appointed Personal Representative of the Estate of DEBORA M. BURGESS and on behalf of all statutory wrongful death beneficiaries,<br><br>Plaintiffs,<br><br>v.<br><br>DAIMLER TRUCK NORTH AMERICA, LLC, a Delaware limited liability company; HTS LOGISTICS, INC, an Illinois corporation; SAHIL TAYA, husband; JANE DOE TAYA, wife; and XYZ CORPORATIONS (1-5),<br><br>Defendants. | Case No. 1:23-CV-03054-MKD<br><br>ORDER DENYING DAIMLER TRUCK NORTH AMERICA, LLC'S *DAUBERT* MOTION REGARDING MR. HARRINGTON AND PLAINTIFFS' *DAUBERT* MOTION REGARDING DR. KUYKENDAL<br><br>**ECF Nos. 107, 112** |

On July 29, 2025, September 23, 2025, and September 29, 2025, the Court held hearings on Daimler Truck North America, LLC's Motion to Exclude the Opinions and Testimony of Shawn Harrington, ECF No. 107, and Plaintiffs' Motion to Exclude Certain Opinions and Testimony of Michelle Kuykendal, ECF

ORDER - 1

No. 112.  ECF Nos. 169, 180, 182.  Lincoln Sieler, Michael Angiulo, Kenneth Friedman, and Kevin Coluccio appeared on behalf of Plaintiffs.  Michael Kleffner, Brian Armstrong, and Jennifer Artman appeared on behalf of Defendant Daimler Truck North America, LLC ("DTNA").  Skyler Urban appeared on behalf of Defendant HTS Logistics, Inc. and Defendant Sahil Taya.[1]  The Court has considered the motions and the record, has heard from counsel, and is fully informed.  For the reasons stated below, the Court denies the motions.

## BACKGROUND

The parties are familiar with the facts of this case.  Relevant here is that on August 15, 2022, Deborah Burgess was struck by a commercial motor vehicle ("CMV"), a 2022 Freightliner Cascadia, and subsequently died from her injuries.  ECF No. 1 at 5-6 ¶¶ 3.5-3.6, 3.9.  Plaintiffs have brought a claim of strict product liability against DTNA under the Washington Product Liability Act ("WPLA").  *Id.* at 25-28.  Plaintiffs' strict product liability claim is based on the Freightliner Cascadia involved in the underlying collision not being equipped with DTNA's own "collision avoidance technology system," the Detroit Assurance 5.0 ("DA5"), "that included forward collision detection, pedestrian detection, driver warning,

---

[1] Defendant HTS Logistics, Inc. and Defendant Taya "do not take a position" on either motion.  ECF No. 116 at 2; ECF No. 117 at 2.

ORDER - 2

and automatic emergency braking capabilities," which Plaintiffs allege could have prevented the collision.  *Id.* at 10 ¶ 3.22.

Plaintiffs retained Shawn Harrington as an accident reconstruction expert, *see* ECF No. 108-1 at 2, and DTNA retained Michelle Kuykendal, Ph.D. to respond to Mr. Harrington and to conduct her own testing.  *See* ECF No. 120-1 at 3.

## LEGAL STANDARD

Under Fed. R. Evid. 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

District courts are gatekeepers of expert testimony, tasked with preventing "unfounded or unreliable opinions from contaminating a jury trial." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1020 (9th Cir. 2022) (citing *Daubert v.*

ORDER - 3

*Merrell Dow Pharm., Inc.*, 509 U.S. 579, 586, (1993)).  "Rule 702 of the Federal Rules of Evidence tasks a district court judge with 'ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Id.* at 1023 (quoting *Daubert*, 509 U.S. at 597 and citing *Daubert v. Merrell Dow Pharms., Inc. ("Daubert II")*, 43 F.3d 1311, 1313 (9th Cir. 1995)).

"Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.  And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp, Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (citation omitted).

## DISCUSSION

### A. Shawn F. Harrington

*1.  Mr. Harrington's Methodology*

Mr. Harrington reconstructed the collision between the Freightliner and Ms. Burgess using photogrammetry analysis, which included modeling the collision using VCRASH 5.0 software.  ECF No. 108-1 at 74-80.

Mr. Harrington then conducted a series of tests using a 2021 Freightliner New Cascadia "to develop a more in-depth appreciation of the performance of the Forward Collision Warning (FCW) and Automatic Emergency Braking (AEB) in a pedestrian detection scenario of the [DA5]." *Id.* at 113.  "[T]he testing involved

ORDER - 4

simulating a pedestrian crossing scenario, whereby the test 2021 Freightliner Cascadia was driven towards the sun while a 4activePA articulating pedestrian target was pulled from right to left into the Freightliner's path at an angle of approximately 45 degrees." *Id.* "The pedestrian target was pulled using a rope and winch system." *Id.* In four tests, "partial cloud cover obscure[ed] the sun." *Id.* at 116. The remaining nine tests were conducted in "direct sun." *Id.*

Mr. Harrington relied on thirteen of his test runs to support his conclusions.[2] *See id.* at 118-19. He concluded that the tests with "partial cloud cover" resulted in a FCW at "an average [Time to Collision (TTC)] of 2.39 seconds" and that in the tests with "direct sun, the average TTC at FCW was 1.11 seconds." *Id.* at 116. "In the four tests with partial cloud cover, the [DA5] initiated AEB at an average TTC of 2.04 seconds . . . ." *Id.* at 117. "In the remaining nine tests, the [DA5] initiated AEB at an average of TTC of 1.01 seconds . . . ." *Id.*

The testing was documented by data acquisition systems and filming of the tests using drones. *Id.* at 113. In particular, "[a] Racelogic VBOX 3iSL-RTK Advanced Driver Assistance System (ADAS) data acquisition system was utilized

---

[2] Mr. Harrington excluded eleven test runs. *See id.* at 115 ("In the first four tests, the pedestrian target was not able to be pulled at the target 3 mph consistently without falling over due to an uneven inclined surface."); ECF No. 108-6 at 2-3.

ORDER - 5

to measure speeds, distances, accelerations, and times of the issuance of the [FCW] in the 2021 Freightliner Cascadia." *Id.* at 114. A "VBOX Sport was placed inside the pedestrian target to measure the pedestrian speed." *Id.*

To ensure collaboration between his testing and his reconstruction, "a top down VCRASH view was overlaid with a . . . drone video from the test program. The position of the truck and pedestrian in the VCRASH analysis was compared with the same in the testing video from one to four seconds prior to impact." *Id.* at 101 ¶ 84.

*2. Discussion*

Under Fed. R. Evid. 702, expert testimony must be "the product of reliable principles and methods." "[A] key question" to determine whether testimony is the product of reliable principles and methods is "whether it can be (and has been) tested." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993). "Under *Daubert's* testability factor, the primary requirement is that '[s]omeone else using the same data and methods . . . be able to replicate the result[s].'" *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1047 (9th Cir. 2014) (alterations and omissions in *City of Pomona*) (quoting *Zenith Elecs. Corp. v. WH–TV Broad. Corp.,* 395 F.3d 416, 419 (7th Cir. 2005)). If a methodology cannot be replicated, this weighs against admissibility. *See, e.g.*, *United States v. Cloud*, 576 F. Supp. 3d 827, 841 (E.D. Wash. 2021) (finding methodology to not be "entirely

ORDER - 6

replicable" and that this factor weighed against admissibility); *United States v. Adams*, 444 F. Supp. 3d 1248, 1264 (D. Or. 2020).  However, expert testimony may be admissible despite "imperfect execution of laboratory techniques whose theoretical foundation is sufficiently accepted in the scientific community to pass muster under *Daubert*."  *City of Pomona*, 750 F.3d at 1047-48 (quotation marks and citation omitted).

DTNA seeks to exclude Mr. Harrington's testing on the ground that "it would be ***impossible*** to replicate what Mr. Harrington did in his testing."  ECF No. 107 at 2.  Specifically, DTNA asserts Mr. Harrington's test is unreliable and cannot be replicated due to: (1) poorly controlled and variable test truck paths, (2) poorly controlled and variable pedestrian paths, and (3) other test aspects illustrating inconsistency.  *Id.* at 11-15.

a.  Test Truck Paths

DTNA challenges Mr. Harrington's test truck data on three grounds: (1) "the GPS data obtained for Mr. Harrington's test truck is obviously inaccurate"; (2) "Mr. Harrington introduced significant variability in the truck path, such that it renders any conclusions unreliable"; and (3) "the path taken by Mr. Harrington's test truck was essentially straight" and did not include a right turn as occurred in the subject incident.  *Id.* at 11-12.

First, DTNA relies on Dr. Kuykendal's report in which she "plotted the

ORDER - 7

location of Mr. Harrington's test truck in the test runs" to assert that the GPS data is "clearly wrong" as it shows the truck making "impossible" "hops" or "sidesteps." *Id.* at 11 (citing ECF No. 108-7 at 21). DTNA asserts that without accurate GPS data there is "inadequate positional data" to recreate the path taken by Mr. Harrington's test truck. *Id.*

While DTNA challenges Mr. Harrington's GPS data, Mr. Harrington did not rely on GPS data from the test truck and the test pedestrian in his methodology. The VBOX 3iSL-RTK system installed on the test truck was only used to measure "speeds, distances, accelerations, and times of the issuance of the [FCW] in the 2021 Freightliner Cascadia." ECF No. 108-1 at 114. To obtain positional data, Mr. Harrington instead utilized videos, including drone video. *See id.* at 101 ¶¶ 84, 113-15. The fact that DTNA would have preferred Mr. Harrington to rely on GPS data, as Dr. Kuykendal did, rather than video data does not establish that Mr. Harrington's methodology is unreliable or that adequate data did not exist to analyze the paths taken by Mr. Harrington's test trucks.

Second, despite asserting that there is "inadequate positional data" to recreate the path taken by Mr. Harrington's test truck, DTNA asserts that "Mr. Harrington's test paths 'exhibited a variance in distance of up to 20.8 feet.'" ECF No. 107 at 11 (citing ECF No. 108-7 at 19). This variance was calculated using the GPS data from Mr. Harrington's test truck. *See* ECF No. 108-7 at 19-21. Mr.

ORDER - 8

Harrington explained that the VBOX 3i would not accurately reflect the path of the test truck, as it was "not an earth fixed-based GPS that we were plotting on the VBOX 3i." ECF No. 133-2 at 11. The fact that GPS, which was not "not an earth fixed-based GPS," showed a variance in test paths does not establish that Mr. Harrington's methodology is unreliable.

Third, DTNA also asserts that the path taken by Mr. Harrington's test truck was "essentially straight" rather than turned to the right. ECF No. 107 at 12. Again, DTNA relies on Dr. Kuykendal who utilized an accident reconstruction performed by DTNA's expert Gregory Stephens. ECF No. 108-7 at 9 ("Based on the video footage of his testing, Mr. Harrington's tractor approach path was nearly straight."), 82 ("[M]y analysis of Mr. Harrington's testing methodology concludes that Mr. Harrington utilized a nearly straight-path vehicle approach instead of a subject-relevant vehicle approach in his testing. His straight-path testing approach resulted in the pedestrian target entering the path of the tractor substantially earlier than what occurred during the subject incident, as described by Stephens'[s] accident reconstruction.").

During his deposition, Mr. Stephens explained that the path was created by "basically walking through all of those points that we had analyzed and constructing a line and a series of arcs that essentially replicate that path as a best fit" and that he could not provide a "qualified error rate." ECF No. 133-3 at 7-8.

ORDER - 9

Mr. Harrington, meanwhile, testified that he did not replicate Mr. Stephens's reconstruction, with which he disagreed.  Mr. Harrington instead created his own reconstruction using photogrammetric analysis.  *See* ECF No. 108-1 at 74-80; ECF No. 134 at 7 ¶ 17.  After testing, he compared this VCRASH reconstruction with a drone video from one of his test runs to determine collaboration between the two. ECF No. 108-1 at 101 ¶ 84.  In sum, while Mr. Harrington's test truck path may have differed from that relied upon by DTNA's experts, Mr. Harrington explained the methodology he used to develop this reconstruction and that it followed generally accepted techniques in the field of accident reconstruction.

In sum, the Court denies DTNA's motion to exclude Mr. Harrington's testimony on the basis that his test truck paths were poorly controlled and variable.

b.  Pedestrian Paths

DTNA argues that "[t]he path taken by Mr. Harrington's pedestrian target was also poorly controlled and highly variable."  ECF No. 107 at 12.  Specifically, DTNA takes issue with (1) Mr. Harrington using two assistants – one to keep the pedestrian target upright and another to operate a sled that pulled the pedestrian target, (2) the variability of the pedestrian path – up to 22 feet, and (3) "Mr. Harrington's pedestrian target enter[ing] the test truck's path *much earlier* than Ms. Burgess entered the subject truck's path."  *Id.* at 12-13.

First, DTNA asserts that Mr. Harrington's assistants may have interfered

ORDER - 10

with the DA5 radar and camera. *Id.* at 13. "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method does not render expert testimony inadmissible. . . . The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." *Hardeman v. Monsanto Co.,* 997 F.3d 941, 962 (9th Cir. 2021) (quotation marks, alterations, and citations omitted). Here, Mr. Harrington asserts that the assistants let go of the pedestrian "long enough before where it did not have any influence on [his] testing," ECF No. 133-2 at 13-14, and that he downloaded the test truck's Video Radar Decision Unit ("VRDU") data, which records when an object triggers the system, *see* ECF No. 108-1 at 118-19. While introducing the additional variable of assistants into his tests could be a flaw, such a flaw is not large enough for the Court to find that Mr. Harrington "lacks good grounds for his . . . conclusions." *Hardeman,* 997 F.3d at 962 (quotation marks and citation omitted).

Second, DTNA again relies on Dr. Kuykendal's report in which she plotted the location of the pedestrian target in test runs based on its GPS data to assert that Mr. Harrington's pedestrian path was variable. ECF No. 107 at 13 (citing ECF No. 108-7 at 19). During the *Daubert* hearing, Mr. Harrington explained that the pedestrian was not equipped with high-precision GPS, but only with a VBOX Sport, that was used to measure its *speed*, not its position on Earth. *See* ECF No. 108-1 at 114 ("The VBOX Sport was placed inside the pedestrian target to measure

ORDER - 11

the pedestrian speed."); ECF No. 133-2 at 11 ("The VBOX Sport is never meant for precise GPS positioning. I would think Dr. Kuykendal would understand that."); ECF No. 134 at 9 ¶ 20 ("I never stated – in either my reports or at my deposition – that I used the VBOX Sport for precise positional information on the pedestrian . . . ."). Thus, while DTNA asserts that the GPS data from Mr. Harrington's test pedestrian shows its variability, Mr. Harrington did not rely on such data in reaching his conclusions and offered an explanation for the lack of precision in the VBOX Sport's GPS positioning.

Third, DTNA asserts that Mr. Harrington's pedestrian target entered the test truck's path earlier than Ms. Burgess entered the subject truck's path. ECF No. 107 at 13 (citing ECF No. 108-7 at 10). Specifically, Dr. Kuykendal opines, "The entry of the pedestrian into the tractor path can be quantified by the relative longitudinal distance (RLD) between the pedestrian and tractor at the time the pedestrian reaches a 6 foot lateral distance from vehicle centerline. According to Mr. Stephens'[s] accident reconstruction analysis, this occurred at an RLD of approximately 7.5 feet in the subject incident." ECF No. 108-7 at 9 (footnotes omitted). Dr. Kuykendal found that in Mr. Harrington's testing, "the pedestrian enter[ed] the path of the tractor over a range of 10.7 ft. – 23.2 ft." *Id.* at 10. DTNA is welcome to raise this issue on cross-examination, but the Court does not find the variability in the distance at which the pedestrian entered the path of the

ORDER - 12

truck renders Mr. Harrington's testing unreliable when, as discussed above, Dr. Kuykendal and Mr. Harrington are not utilizing the GPS data from the pedestrian target in the same manner and are relying on different accident reconstructions. It is a question for the jury to determine the point at which Ms. Burgess entered the truck's path and the accuracy of each accident reconstruction offered.[3]

---

[3] The parties have emphasized the significance of the 2023 Amendments to Fed. R. Evid. 702. Under Fed. R. Evid. 702, it is for the Court to determine whether "it is more likely than not" that an expert's "testimony is the product of reliable principles and methods" and that an expert's "opinion reflects a reliable application of the principles and methods to the facts of the case." Here, the Court has determined that it is more likely than not that Mr. Harrington's testimony is the product of "reliable principles and methods" and that he applied such principles and methods to the facts of this case. That the experts have come up with different reconstructions "does not necessarily require exclusion of either side's experts." *See* Fed. R. Evid. 702 Committee Notes on Rules—2023 Amendment ("It will often occur that experts come to different conclusions based on contested sets of facts. Where that is so, the Rule 104(a) standard does not necessarily require exclusion of either side's experts. Rather, by deciding the disputed facts, the jury can decide which side's experts to credit.").

ORDER - 13

In sum, the Court denies DTNA's motion to exclude Mr. Harrington's testimony on the basis that his "pedestrian target was poorly controlled and highly variable."

c.  Other Aspects

DTNA also asserts that other aspects of Mr. Harrington's tests illustrate inconsistency.  ECF No. 107 at 14.  Namely, DTNA points to variability in the speeds of the test truck and pedestrian target, variability in the TTC at FCW audio, variability in the steering angle at FCW audio, variability in in the accelerator pedal percentage; and that "four of Mr. Harrington's runs were with partial cloud cover – unlike at the time of the subject accident." *Id.* at 14-15.  DTNA contends that such variability "render[s] Mr. Harrington's tests unreliable and incapable of duplication." *Id.* at 15.

The Court finds that such variability does not render Mr. Harrington's testing methodology so flawed that it is unreliable and denies DTNA's motion for summary judgment on this ground.  *See Hardeman,* 997 F.3d at 962.

In conclusion, the Court denies DTNA's motion to exclude Mr. Harrington's testimony on the grounds that his test results would be "would be ***impossible*** to replicate." ECF No. 107 at 2.

**B. Dr. Michelle Kuykendal**

*1.  Dr. Kuykendal's Methodology*

ORDER - 14

Dr. Kuykendal performed both in-path pedestrian testing, consisting of subject path – driver-applied braking tests, subject path – no braking applied, and straight approach testing, and out-of-path pedestrian testing, consisting of an on-curb scenario and an approach-and-stop scenario.  ECF No. 120-1 at 31-32.  "'In-path' is defined as the point at which the pedestrian would enter a hypothetical driving lane of the tractor."  *Id.* at 33.

The subject path – driver-applied braking tests involved ten tests in which "the tractor and pedestrian approach paths were derived from the accident reconstruction of Mr. Stephens."  *Id.* at 35.  Seven tests were conducted at "high sun angle" and three at "low sun angle" and all were "terminated with driver-applied braking."  *Id.*  Dr. Kuykendal did not observe any FCW alerts or AEB interventions in any of these tests.  *Id.* at 38. "In all ten tests, the driver applied the brakes between 0.5 and 1.0 seconds TTC, coming to rest between 0.9 and 2.9 feet, Relative Longitudinal Distance."[4]  *Id.* at 42.  "In order to assess whether any alerts or activations may have come late in the scenario and after driver-applied braking,

---

[4] "The location of the pedestrian when it becomes in-path is quantified by its Relative Longitudinal Distance (RLD) to the front bumper of the tractor when the lateral distance drops below 6 feet.  Forward impact between the tractor and pedestrian can only occur if RLD becomes zero."  *Id.* at 33.

ORDER - 15

[Dr. Kuykendal] performed one test in which there was no driver-applied braking, and, instead, the tractor and pedestrian paths were allowed to proceed through the complete course of the programmed paths"—the subject path – no braking applied test. *Id.* at 44.  In this test, "the tractor impacted the pedestrian, and there were no FCW alerts or AEB activation." *Id.* at 45.

Dr. Kuykendal also conducted "straight approach testing" in which she "altered the test scenario from the incident-relevant tractor and pedestrian paths to a straight-line approach of the tractor" in order "to understand the significance and effect of a vehicle approach path toward a pedestrian target on the ability of a [DA5] forward collision mitigation system to perceive and respond to an imminent collision between the two." *Id.* at 54.  In this testing, the pedestrian crossed in front of the tractor at 45-degree angle. *Id.* at 58.  Dr. Kuykendal performed "7 tests at high sun angle and 3 at low sun angle, all of which were terminated by an AEB intervention provided by [DA5]." *Id.* at 54.  "The driver was instructed to apply the brakes if he perceived that a crash was imminent" and "[i]n one test, the driver applied the brakes out of caution, however, the ABA system issued an FCW alert and applied braking nearly concurrently to the driver." *Id.*  The driver did not brake in the other tests. *Id.*  The DA5 system issued FCW alerts and AEB in all ten straight approach tests. *Id.* at 54-56

Dr. Kuykendal also conducted out-of-path pedestrian testing "to understand

ORDER - 16

how the [DA5 ABA system] would respond for just-out-of-path pedestrians." *Id.* at 60. This out-of-path testing consisted of "7 tests where the pedestrian remained stationary at a distance of 6 feet outside the centerline of the tractor, just out of the path of travel" (the on-curb scenario) and 7 tests where "the pedestrian's trajectory was programmed to stop when the pedestrian reached a six-foot offset from the centerline of the tractor path, commensurate with stopping just outside a standard driving lane" (the approach-and-stop scenario). *Id.* at 60-62.

Plaintiffs *Daubert* Motion focuses on Dr. Kuykendal's subject path – driver-applied braking tests and her subject path – no braking applied test.

*2. Discussion*

Plaintiffs seek to exclude Dr. Kuykendal's testimony on the ground that "[h]er testimony methodology is unreliable and her conclusions are speculative." ECF No. 112 at 1. Specifically, Plaintiffs argue Dr. Kuykendal's testing was unreliable because: (1) the tests were not run to impact, (2) the AEB system may not have engaged due to the driver's activity, and (3) the mannequin did not occlude the radar in the one test that was run to impact. *Id.* at 4-8.

a. Tests Not Run to Impact

Plaintiffs assert that in her subject path – driver-applied braking tests, Dr. Kuykendal had the driver stop before impact with the mannequin despite acknowledging in a recent paper that "the ideal method to test an AEB system was

ORDER - 17

to allow the test vehicle to collide with a disposable target at a safe speed." *Id.* at 4 ("While non-impact testing is effective for determining the timing of FCW and of the onset of AEB, the ideal methodology to determine the degree of AEB intervention is to perform no-swerve tests." (emphasis omitted) (quoting ECF No. 113-5 at 12)).

First, Dr. Kuykendal explained that non-impact testing is commonly used that there are two forms of non-impact test: swerve testing and brake testing and the reason why she chose brake testing—due to the slow speed of the test vehicle (6-8 miles per hour), swerve testing would have required swerving early.  ECF No. 120-2 at 66; ECF No. 120-3 at 3 ("At very low speeds, in order to perform a swerve or evasive maneuver with the truck, it would have had to be executed significantly earlier than the braking test termination that I elected to perform."); ECF No. 120-3 at 12 ("So when I'm performing testing in order to have a higher test count, testing in which there is deliberately an avoidance of collision is an accepted methodology."); ECF No. 120-3 at 12-13 ("At higher speed testing, swerve testing, swerve or avoidance maneuver testing is a widely accepted methodology.").

Second, for this series of tests, Dr. Kuykendal measured the TTC, which she calculated using the time approximately 50 milliseconds prior to brake activation and obtained results ranging from 0.5 to 1.0 seconds.  ECF No. 120-1 at 40.  As

ORDER - 18

Dr. Kuykendal explained during the hearing, this means that her driver would have impacted the test target within a half second to one second if he had not utilized the brakes.  In contrast, Mr. Harrington generally observed FWC and AEB interventions earlier than one second before TTC.  *See* ECF No. 108-1 at 118-19. Thus, the Court does not find that Dr. Kuykendal lacked "good grounds" for her conclusions based on not running these ten subject path tests to impact.  *See Hardeman,* 997 F.3d at 962.

Third, the paper cited by Plaintiffs looked at whether "[f]or tests in which impact with the test target is not acceptable, or as a means of increasing test count, an alternative test termination methodology may be used," namely "the application of a late steering maneuver by the driver to avoid the target prior to a potential collision."  ECF No. 113-5 at 2.  "In this study, a test series was performed with and without late steering input to determine if this alternative AEB evaluation methodology can be used to accurately predict the degree to which an AEB system performs."  *Id.*  The study found:

> In summary, there can be large AEB performance variability across different scenarios as well as within a single scenario.  Generating a single deceleration model to predict test outcomes within a scenario has significant limitations.  While non-impact testing is effective for determining the timing of FCW and of the onset of AEB, the ideal methodology to determine the degree of AEB intervention is to perform no-swerve tests.  However, this is often impractical. For future work, one might consider generating *multiple* deceleration models by first

ORDER - 19

categorizing the swerve termination tests into distinct groups.  When attempting to formulate a prediction for a no-swerve test, one would then use the model from the group that most closely matches.  This endeavor would require significantly more swerve termination test statistics, but it may improve the quality of predictions without increasing the number of no-swerve tests that are needed.

*Id.* at 12.  In sum, the study found that "no-swerve tests" were "the ideal methodology to determine the ***degree*** of AEB intervention," but "non-impact testing is effective for determining the timing of FCW and of the onset of AEB." *Id.* (emphasis added).  Thus, Dr. Kuykendal's cited study does not undermine her report here, which was not looking the degree of AEB intervention, but whether the DA5 system would engage.

Last, Dr. Kuykendal did perform a full-impact test.  ECF No. 120-1 at 44-51; ECF No. 120-2 at 62-63.

In sum, the Court denies Plaintiffs' motion to exclude Dr. Kuykendal's testimony on the ground that it is unreliable because most of her tests were not run to impact.

b.  Driver's Activity

Plaintiffs argue that Dr. Kuykendal did not conduct any "analysis to determine whether her driver's actions to successfully avoid a collision explained why the system did not engage during those tests."  ECF No. 112 at 6.

To the extent Plaintiffs raise a concern regarding Dr. Kuykendal's driver

ORDER - 20

braking to avoid the pedestrian target, Dr. Kuykendal terminated her tests 50 milliseconds before braking, ECF No. 120-1 at 40, to avoid the braking activity impacting her results.  Dr. Kuykendal also explained during her deposition that while she did not terminate the test at the point the driver lifted his foot from the accelerator that this action would not have overridden the DA5 system.  ECF No. 120-3 at 7-10.

According to the Freightliner Cascadia Operator Manual:

> The Active Brake Assist (ABA) system cannot be turned off.  However, the ABA is suppressed when the drive:
> - Uses the signal during an audible warning;
> - Rapidly presses the accelerator; or
> - Presses the accelerator pedal beyond the pressure point (kickdown).

ECF No. 120-4 at 2.  Dr. Kuykendal's driver did not engage in any such actions that would have suppressed the ABA system.

To the extent that Plaintiffs are asserting other driver activity might have impacted the DA5 system, Dr. Kuykendal explained:

> [T]here are other conditions, for example, where the collision may no longer be imminent, and I would say that that doesn't suppress a system, but it could . . . stop a cascade, for example.  But what we're talking about here is the driver lifting his foot from the accelerator, a collision still being imminent, and we have no basis to say that it wasn't.  And so there's no reason to say that a warning or braking could not have still been issued during that time.

ECF No. 120-3 at 10.  Mr. Harrington's own test results illustrate that the DA5

ORDER - 21

system may still activate when the vehicle is not accelerating.  *See* ECF No. 108-1 at 118-19.

In sum, the Court denies Plaintiffs' motion to exclude Dr. Kuykendal's testimony on the basis that the system might not have engaged due to her driver's activity.

c.  Mannequin

Plaintiffs argue that in the one test performed to contact the mannequin was not in the center of the bumper, unlike Ms. Burgess, and thus did not come into the radar's field of view.  ECF No. 112 at 7-8.

First, Dr. Kuykendal explained during her hearing testimony that the radar field of view extends beyond the center of the truck.

Second, Dr. Kuykendal explained during her deposition and hearing testimony that "pedestrian detection is enabled by the combination radar camera fusion system of the [DA5]."  ECF No. 127-2 at 15; *see also* ECF No. 120-1 at 22. Thus, whether a pedestrian is in the radar's field of view is not determinative regarding whether the DA5 system will engage.

In sum, the Court does not find that Dr. Kuykendal lacked "good grounds" for her conclusions based on the location of the mannequin.  *See Hardeman,* 997 F.3d at 962.  Accordingly, the Court denies Plaintiffs' motion to exclude Dr. Kuykendal's testimony based on the test mannequin's location during the test

ORDER - 22

performed to contact.[5]

Accordingly, **IT IS HEREBY ORDERED:**

1.      Defendant Daimler Truck North America, LLC's Motion to Exclude the Opinions and Testimony of Shawn Harring, **ECF No. 107**, is **DENIED**.

2.      Plaintiffs' Motion to Exclude Certain Opinions and Testimony of Michelle Kuykendal, **ECF No. 112**, is **DENIED**.

**IT IS SO ORDERED.**  The District Court Executive is directed to file this Order and provide copies to counsel.

DATED September 30, 2025.

*s/Mary K. Dimke*
MARY K. DIMKE
UNITED STATES DISTRICT JUDGE

---

[5] Dr. Kuykendal also asserts that the position of Ms. Burgess during the collision and the mannequin in the contact test-run are similar.  *See, e.g.*, ECF No. 120-2 at 48-55.  The Court declines to address the position of Ms. Burgess at the time of the collision, as this is a question of fact for the jury.  *See* Fed. R. Evid. 702 Committee Notes on Rules—2023 Amendment.

ORDER - 23